## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRAIG ALAN SPENCER,                          )
                                             )
                    Plaintiff,               )
                                             )
vs.                                          )     Civil No.  15-cv-1319-JPG-CJP
                                             )
NANCY A. BERRYHILL,                          )
Acting Commissioner of Social Security,      )
                                             )
                    Defendant. [1]           )
                                             )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. §405(g), plaintiff Craig Alan Spencer is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).

### Procedural History

Plaintiff applied for benefits on April 25, 2012 alleging disability beginning on January 18, 2011. (Tr. 11). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Karen Sayon denied the application for benefits in a decision dated May 23, 2014. (Tr. 11-25). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  See, *Casey v. Berryhill*, __ F3d. __, 2017 WL 398309 (7th Cir. Jan. 30, 2017).  She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

1. The ALJ's analysis of Plaintiff's treating physicians' opinions was legally insufficient and the ALJ's decision to reject those opinions was not supported by substantial evidence.

2. The ALJ's residual functional capacity (RFC) assessment was not supported by substantial evidence because she failed to provide the basis for her conclusions.

3. The ALJ's credibility assessment was legally insufficient.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC,

as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v.Astrue, 539 F.3d 668, 674* (7th Cir. 2008)(quoted in *Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011)).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.")

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Sayon followed the five-step framework described above. She determined that plaintiff did not engage in substantial gainful activity from his alleged onset through the date of her opinion. She found that plaintiff had severe impairment of cervical degenerative disc disease, status-post fusion. (Tr. 13).

The ALJ found plaintiff had the residual functional capacity to perform work at the light level, with physical and mental limitations. (Tr. 17-23). Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to perform his past work. (Tr. 23). However, he was not disabled because he was able to perform other work that existed in significant numbers in the regional and national economies. (Tr. 24).

<u>**The Evidentiary Record**</u>

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1.  Agency Forms.

Plaintiff was born on March 22, 1961 and was forty-nine years old at his alleged onset date. (Tr. 194). He was five feet eight inches tall and weighed one hundred and seventy-five pounds. (Tr. 205). He was insured for DIB through December 31, 2016. (Tr. 194). He completed high school and a four year electrician apprenticeship program. (Tr. 206). He previously worked as an electrician for twenty-six years. (Tr. 196).

Plaintiff claimed a neck compression injury, depression, and chronic pain limited his ability to work. (Tr. 205). In June 2013, he was taking Atenolol and Benazepril for high blood pressure; Tramadol, Aleve, and Ibuprofen for pain; and Citalopram for depression. (Tr. 292). He stated that the Atenolol, Benazepril, and Tramadol made him dizzy and the Citalopram made him drowsy. (Tr. 287).

Plaintiff completed a function report in July 2012. (Tr. 252-59). He lived in a house with family. He indicated his ability to work was limited because he could not lift more than twenty pounds or carry things for more than a short distance. He was unable to lift things above his head, his range of motion in his neck was limited, and if he stood or walked for more than three hours he became dizzy and nauseated. (Tr. 252).

On a daily basis, plaintiff showered, shaved, made the bed, did the dishes, took out the trash, fed his dogs, watched television, watered plants, and took naps. His wife helped him care for his dogs. Prior to his injuries, he was able to hike, kayak, and bow hunt. (Tr. 253). Plaintiff

could prepare simple meals, like frozen meals or sandwiches, on a daily basis. (Tr. 254). He went outside daily, went to church weekly, and was able to drive a car. He shopped in stores for food and clothing about twice a week for ten or fifteen minutes at a time. He could handle his finances. (Tr. 255).  He talked on the phone every day and went out to eat or visited with friends once a month. (Tr. 256).

Plaintiff claimed he had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, and using his hands.  He indicated he could lift twenty pounds, squat for two minutes, walk for a few blocks, sit for two hours, climb one flight of stairs, and pay attention for one hour at a time.  He followed written instructions well but had difficulty with spoken instructions. (Tr. 257). He had no problem with authority figures. He stated that his Hydrocodone and Tramadol caused drowsiness. (Tr. 259).

Plaintiff's wife also completed a function report in July 2012. (Tr. 230-37). She indicated he could not stand, walk, or lift as was required in his previous job. If he walked or stood for a long period of time he became nauseated and would get severe headaches. She stated that plaintiff could not turn his head or move his head to look up. He also had numbness and shaking in his hands. (Tr. 230). Plaintiff's wife stated that prior to his injuries he could bow hunt, go backpacking, and sightsee. She said plaintiff would wake up with severe neck pain for several hours in the middle of the night and as a result he rarely slept through the night undisturbed. (Tr. 231).

Plaintiff's wife felt that plaintiff's injuries made it difficult for him to lift, squat, stand, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, use his hands, and get along with others. (Tr. 235). She felt plaintiff no longer handled stress well and he had a

short temper. He did not remember conversations well. (Tr. 236). Plaintiff's wife said that after his injury plaintiff was no longer the same person. He was very active prior to injury and after the injury he slept and watched television for most of the day. She stated it was easy to tell he was in constant pain. (Tr. 237).

### 2. Evidentiary Hearing.

Plaintiff was represented by counsel at the evidentiary hearing held on April 14, 2014. (Tr. 33-62). At the time of the hearing plaintiff was fifty-three years old and lived by himself. (Tr. 37). He had a driver's license and his main issue while driving was concentrating. (Tr. 37-38). He was previously an electrician and inside wireman. (Tr. 39). On several job sites he held a supervisory position. (Tr. 40). Plaintiff attempted to return to work after his alleged onset date but was unable to work more than ten days. (Tr. 38-39). Plaintiff received worker's compensation and was required to do a job search to retain those benefits. (Tr. 39).

Plaintiff had surgery on his neck in August 2011. He testified that it initially helped and the feeling in his right arm and fingertips returned. The surgery caused his right hand to have tremors and his motor skills to be impaired. (Tr. 40). He stated that he still had constant pain in his neck that he rated a seven out of ten on a daily basis. He had a higher level of pain when he tried to physically exert himself or take a long car ride. Plaintiff testified that when he attempted physical therapy the pain was so severe that he would vomit. He could ride in a car for about three hours before the pain became unbearable. (Tr. 41). He testified that he could walk for about twenty minutes, stand for an hour or two, and he could not sit for a substantial amount of time. He spent most of his day reclined with his head supported. (Tr. 42).

Plaintiff testified that the most he could lift was twenty pounds but could only do that once. He could regularly lift or carry a gallon of milk or a twelve pack of soda. (Tr. 42). He felt

that his medication caused his difficulties with concentration and insomnia. (Tr. 43). Plaintiff was depressed and had suicidal thoughts on occasion. He spoke with one of his doctors about his symptoms and had been taking an antidepressant for two years. (Tr. 44). He occasionally drank alcohol and drank to the point of intoxication twice since 2010. (Tr. 44-45).

Plaintiff described a typical day for the ALJ. He stated that he spent a lot of time at his parents' house because his father had Alzheimer's and they lived next door to him. He cooked for his father and watched television with him. He stated that he spent a lot of time caring for his father.  He did laundry in small and short loads and cleaned "a little bit here and a little bit there."  He did his own grocery shopping as well.  Plaintiff stated that he had a small apartment it was not hard to keep it maintained. (Tr. 45).  He testified that he could do chores for ten to fifteen minutes at a time and then would need a thirty to forty minute break to rest. (Tr. 45, 50). During that time resting he needed to lie completely flat. (Tr. 51).

Since 2010, plaintiff took trips to the Bahamas, New Orleans, Memphis, and Chicago. When he went to New Orleans he had to stay in bed for a day after traveling. (Tr. 46). While in New Orleans, he attempted to go fishing with his friends but had severe pain. (Tr. 48). Plaintiff moved out of his home with his wife in 2013 and was in the process of getting divorced. He testified that his physical and mental limitations were the primary reason for the divorce. They were married for thirteen years before they separated. (Tr. 49). Plaintiff indicated he was short tempered with friends and had difficulty getting along with others. (Tr. 49-50). He had anxiety attacks and small stressors would bother him greatly. (Tr. 51). He had difficulty staying focused and would have to reread a page of information several times. (Tr. 54). Plaintiff testified that he had one or two headaches daily at the base of his skull. During the hearing, plaintiff cradled his

head in his arm to take the pressure off of his neck. (Tr. 53). He stated that in order for him to have a job he would have to be able to lie down whenever he needed. (T. 55).

A vocational expert (VE) also testified. (Tr. 56-61). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform light work with no climbing ladders, ropes, or scaffolds, and frequent but not constant climbing of ramps and stairs. The person could occasionally stoop, crouch, and crawl, and occasionally use vibrating tools. The individual could also occasionally reach overhead and do work that involves simple instructions and routine tasks. The VE testified that the person would be unable to perform plaintiff's previous work. However, the individual could perform jobs that exist in a significant number within the national and regional economies. Examples of such jobs are sorter, hand packager, and inspector. (Tr. 58-59).

The VE also testified that the person could be off task for fifteen percent of the day and retain competitive employment.  If the person needed thirty minute breaks after fifteen minutes of work no jobs would be available. (Tr. 59). Additionally, the VE testified that the individual could not lie down on the job for any amount of time. (Tr. 59-60). The person could miss one day of work a month and remain employed. (Tr. 60). After questioning from plaintiff's attorney, the VE stated that there would be available positions if the person could only occasionally bilaterally handle and never use fine manipulation. (Tr. 60-61).

### 3.  Medical Evidence.

In November 2010, plaintiff presented to neurosurgeon Christopher Heffner, M.D. with muscle spasm and tightness in his neck after an injury. Plaintiff stated that in October he was at work and at the base of a ladder when someone descended and landed on his head. (Tr. 326). He had pain with extension of his neck and when he turned it to either side. Dr. Heffner reviewed an

MRI plaintiff had the month before that indicated plaintiff's cervical spine had minor degenerative changes and bone spurring at C4-5 and C5-6. There was also mild angulation on the MRI study. Dr. Heffner diagnosed plaintiff with cervical spondylosis and neck pain and stated that he suspected physical therapy would help. (Tr. 326-27). Plaintiff began physical therapy that month which he continued through June 2011. (Tr. 669-86).

Plaintiff returned to Dr. Heffner in December 2010 and stated he was doing much better with physical therapy and had less pain. He still had irritation on the right side of his neck but it was not severe. Dr. Heffner thought plaintiff could return to work in two weeks. (Tr. 325). When plaintiff returned to Dr. Heffner in January 2011 he indicated that he attempted to return to work but was not able to tolerate it well. His neck pain increased with traction. A new MRI was taken and Dr. Heffner stated it was close to the same as his previous study with minor degenerative changes, bone spurring, and disc bulging at C4-5 and C5-6. (Tr. 324). The MRI notes also indicate plaintiff had multilevel foraminal stenosis especially at C3-4 and a small hemangioma[2] in the C7 vertical body. (Tr. 329-30).

In February 2011, plaintiff returned to Dr. Heffner and indicated he still had pain and his most recent physical therapy did not help. Dr. Heffner stated that he did not feel plaintiff was a candidate for surgery and he felt he could return to work the next week. Dr. Heffner indicated that if plaintiff did not feel he could return to work then he could refer him to another doctor. (Tr. 323). As a result, in March 2011 plaintiff began treatment with neurologist David Kennedy, M.D. (Tr. 481-82). Dr. Kennedy evaluated plaintiff and stated that plaintiff's range of motion in his cervical spine was reduced by fifty percent. (Tr. 481). Dr. Kennedy's diagnostic impression was chronic cervical pain following injury, he wanted to begin facet injections, and he did not

---

[2] A spinal hemangioma is a benign tumor that typically displays no symptoms.
http://www.upmc.com/Services/neurosurgery/spine/conditions/tumors-lesions/Pages/hemangioma.aspx

think surgical intervention would be necessary. (Tr. 482). Around this time, plaintiff also sought treatment for knee pain from his primary care physician, Dr. Brian McElheny and orthopedist Dr. Mike Davis. (Tr. 320, 364). His record does not indicate the knee pain returned after receiving an injection from Dr. Davis. (Tr. 364).

In April 2011, plaintiff received three cervical nerve root block injections. (Tr. 353-55). He returned to Dr. Kennedy and stated he was better after the injections. He restarted plaintiff on physical therapy and stated plaintiff should remain off of work. (Tr. 479). In June 2011, plaintiff returned to Dr. Kennedy and stated he had no relief from his pain. Dr. Kennedy set plaintiff up with a cervical myelogram to see if any operative intervention was feasible. (Tr. 477). Plaintiff also saw Dr. McElheny that month with worsening symptoms of depression. Plaintiff had crying spells and an anxious mood. (Tr. 361). Dr. McElheny prescribed Celexa and recommended a graduated exercise program. (Tr. 362).

The myelogram showed significant disc abnormalities with nerve root impingement at C4-5 and C5-6. (Tr. 368-71). Dr. Kennedy recommended a cervical discectomy with fusion. (Tr. 475). In August 2011 plaintiff underwent a complete discectomy with microdissection at C4-5 and C5-6, placement of a biomechanical spacer at C4-5 and C5-6, and fusion at C4-5 and C5-6. (Tr. 383-84). Plaintiff was discharged two weeks after his surgery. (Tr. 396). His discharge papers indicated he was depressed but primarily doing well. (Tr. 396-428). Plaintiff followed up with Dr. Kennedy in September and was doing very well. (Tr. 472). When plaintiff returned to Dr. Kennedy in November 2011 he was having pain at the base of his cervical spine and Dr. Kennedy referred him to physical therapy. (Tr. 469). Later that month plaintiff presented at the emergency room with a severe headache that caused him to vomit. (Tr. 439). He was given 800 mg ibuprofen and discharged. (Tr. 444).

In December 2011 Dr. Kennedy reported that plaintiff was doing well and he continued therapy. (Tr. 466). February 2012 imaging was normal and Dr. Kennedy noted plaintiff was making progress in therapy but he could not return to work yet. (Tr. 463). In March 2012 plaintiff returned to Dr. Kennedy and indicated he had not improved. Plaintiff still reported pain with most activities and Dr. Kennedy felt he had reached a plateau with regard to rehabilitation. Dr. Kennedy ordered a functional capacity evaluation. (Tr. 460).

Plaintiff had the evaluation with physical therapist Pamela Hunter in April 2012. Ms. Hunter indicated plaintiff had decreased strength, tremors in his hand, and an inability to tolerate prolonged overhead position. He could not perform frequent fingering or occasional (Ten minutes of) above-shoulder work. (Tr. 580, 582). As a result plaintiff could not return to his work as an electrician, however he could perform light work that allowed him to move around and change position. (Tr. 588). The evening following his FCE with Ms. Hunter plaintiff had a severe tension headache and the FCE was discontinued early secondary to headache and increased pain. (Tr. 599).

In September 2012 plaintiff returned to the emergency room with anxiety and chest pain. (Tr. 530). Plaintiff returned to Dr. McElheny in November 2012 with depression. Dr. McElheny refilled plaintiff's Celexa prescription and wanted him to follow up in six months. (Tr. 570-71). Plaintiff's next records were from July 2013 with Dr. McElheny. He had a decreased range of motion and Dr. McElheny indicated plaintiff had chronic neck pain. (Tr. 762-63). Plaintiff's final record was from March 2014 with Dr. McElheny. He presented with constant nagging neck pain, anxiety, and difficulty concentrating. Dr. McElheny referred plaintiff to a chronic pain specialist. (Tr. 775-76).

### 4.  Independent Medical Consultation.

In March 2011, plaintiff saw Dr. Robert Bernardi at the Olive Surgical Group for an independent medical evaluation. (Tr. 342-47). At the time plaintiff saw Dr. Bernardi he had been to thirty-one physical therapy sessions and stated they helped quite a bit. (Tr. 343). Plaintiff's cervical range of motion was limited but the range of motion in his shoulders was full. (Tr. 344-45). Dr. Bernardi's diagnoses were multilevel degenerative disc disease, multilevel foraminal stenosis, right-sided neck pain, and probable right C6 radiculopathy. (Tr. 345).  He did not think plaintiff was capable of returning to full time work at that time but his prognosis was excellent. (Tr. 346-47).

### 5.  Opinion of Treating Physician.

In July 2013, Dr. McElheny completed a medical source statement to indicate plaintiff's capabilities. (Tr. 746-51).  Dr. McElheny indicated plaintiff could occasionally lift or carry up to twenty pounds but never more. (Tr. 746).  Plaintiff could sit for four hours at a time and a total of five hours a day, and stand or walk for three hours at a time and a total of four hours in a day. Plaintiff would need to shift positions every fifteen to thirty minutes and would need an unscheduled fifteen to thirty minute break every two hours. (Tr. 747). Plaintiff could occasionally use his hands to reach, handle, feel, push, or pull and occasionally use his feet for the operation of foot controls. (Tr. 748).  Plaintiff could also occasionally perform all postural activities. (Tr. 749). Dr. McElheny opined that plaintiff could occasionally be around unprotected heights, moving mechanical parts, operate a motor vehicle, or be in extreme cold and frequently be exposed to humidity, wetness, extreme heat, vibrations, dust, odors, fumes, and pulmonary irritants. (Tr. 750). He also indicated plaintiff's injuries would cause him to miss more than four days of work per month. (Tr. 751).

13

**6. Consultative Examination.**

In September 2012, plaintiff saw state agency physician Adrian Feinerman for a physical consultative examination. (Tr. 556-61). Plaintiff had no difficulties getting on and off the exam table, tandem walking, standing on toes, standing on heels, squatting and arising, or arising from a chair. (Tr. 560). Dr. Feinerman indicated that upon physical examination, plaintiff could sit, stand, walk, hear, and speak normally. Further, he was able to lift, carry, and handle objects without difficulty. (Tr. 561).

**7. RFC Assessments.**

In September 2012, state agency psychologist Howard Tin evaluated plaintiff's mental RFC. (Tr. 71-73). He reviewed plaintiff's records but did not examine plaintiff in person. Dr. Tin indicated plaintiff had non-severe affective disorders. Dr. Tin opined that plaintiff had mild difficulties in activities of daily living and maintaining social functioning. (Tr. 72). He stated that plaintiff's mental illnesses were not severe. (Tr. 73). In February 2013, state agency psychiatrist Kirk Boyenga, Ph.D. reviewed the record and agreed with Dr. Tin's assessment. (Tr. 88).

In October 2012, state agency physician Julio Pardo, M.D. evaluated plaintiff's physical RFC. (Tr. 73-77). He opined that plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds.  Plaintiff could sit, stand, or walk for six hours out of an eight-hour workday. (Tr. 74).  Plaintiff could frequently crawl and climb ramps or stairs and only occasionally climb ladders, ropes, or scaffolds. (Tr. 75). Additionally, he should avoid concentrated exposure to hazards such as machinery or heights. (Tr. 76). Dr. Pardo opined that plaintiff was not disabled. (Tr. 77). In February 2013, state agency physician James Hinchen, M.D. examined the record and agreed with Dr. Pardo. (Tr. 89-92).

14

## Analysis

Plaintiff argues that the ALJ erred in evaluating the treating physicians' opinions, incorrectly formed her RFC assessment, and failed to appropriately consider plaintiff's credibility.  As plaintiff relies, in part, on his testimony, the Court will first consider his argument regarding the ALJ's credibility analysis.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases, "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

The ALJ is required to give "specific reasons" for her credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Id.* See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.").  If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski*, 245 F.3d at 887.

First, plaintiff claims that the ALJ's credibility analysis was legally insufficient. He argues that the ALJ failed to analyze which specific statements plaintiff made were not credible and the extent they were not credible. Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). Additionally, the ALJ did address how some of plaintiff's statements in his testimony were inconsistent and plaintiff acknowledges this within his brief. Plaintiff testified that he no longer enjoyed being around people but had taken several vacations, went out to eat, and attended church. (Tr. 19, 46, 48, 255). Plaintiff testified to a constant pain level of seven that increased with activity but told medical providers his pain was usually a four that dropped to a two and sometimes reached a six. (Tr. 650, 689, 745). The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008.  That is exactly what the ALJ appropriately did in the case at hand.

Plaintiff contends that the ALJ speculated a number of her reasons for forming her credibility assessment.  Plaintiff states that his vacations did not contradict his claimed limitations and the ALJ needed to ask him what his activities were while on vacation.  However, as the Commissioner notes, the ALJ heard testimony about what plaintiff did on vacation. Plaintiff stated he wore a neck brace on vacations and was only able to eat, lie in the sun, and walk short distances. (Tr. 46, 49). The ALJ noted that plaintiff stated he had not gone fishing since his injury but that he was on a fishing boat in New Orleans with friends. (Tr. 19). Plaintiff claims he did not testify that he fished while on the boat.  However, he did state that he attempted to fish in his testimony. (Tr. 48). It is reasonable for the ALJ to draw a conclusion that

plaintiff's claims he did not participate, at all, in any of the activities he used to find enjoyable were not entirely consistent with the record.

The ALJ also looked at plaintiff's activities of daily living. (Tr. 18-19). The Seventh Circuit has held that this is appropriate to consider when evaluating credibility but that it should be done with caution. *Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013). She determined plaintiff's activities were not indicative of someone with the disability plaintiff claimed, as plaintiff took care of himself, prepared meals, took care of his parents, vacationed, cared for animals, bow hunted, and could drive and shop. The ALJ felt plaintiff's complaints did not support the ability to perform these tasks. (Tr. 19-20). The ALJ cannot rely solely on the activities of daily living, but it is appropriate for her to consider the activities when forming her credibility assessment.

The Court agrees with plaintiff that the ALJ incorrectly assumed that his statements that he could not afford treatment were inconsistent with the record because plaintiff purchased beer daily, bought a crossbow, took vacations, and had a large worker's compensation check. If the ALJ had based her credibility determination on this error and plaintiff's activities of daily living it would warrant reversal. Ultimately, however, ALJ Sayon considered other appropriate factors and supported her conclusion with reasons derived from evidence. The Seventh Circuit has held that not all of the ALJ's reasons have to be sound as long as "enough of them are." *Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009).

As a whole, plaintiff's arguments regarding the credibility analysis miss the mark. She discussed plaintiff's treatment history, work history, medications, and testimony. However, she found that based on subjective and objective information contained in the record, some of plaintiff's claims were not entirely credible.

17

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila*, 573 F.3d at 517. See, SSR 96-7p. The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008).  Here, the analysis is far from patently wrong. It is evident that ALJ Sayon considered some of the appropriate factors and built the required logical bridge from the evidence to her conclusions about plaintiff's testimony. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Therefore, her credibility determination stands.

Next the Court will look at plaintiff's argument that the ALJ erred in forming plaintiff's RFC assessment. An RFC is "the most you can still do despite your limitations." 20 C.F.R. §1545(a). In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Id*. "As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."  See *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir.1995).

The ALJ formed her RFC by taking some of the limitations from plaintiff's treating physicians, some of the non-examining state agency consultant's opinions, and added additional limitations with the explanation that additional evidence was submitted after the consultants reviewed the evidence. (Tr. 22). As plaintiff notes, the ALJ did not elaborate on how the more recent evidence submitted led to the conclusions she reached.

For example, the ALJ stated that based on the FCE she limited plaintiff to occasional reaching overhead. (Tr. 22). However, the FCE limited plaintiff to minimal reaching overhead and Dr. Kennedy agreed with that assessment. (Tr. 582, 588, 578). No doctors found plaintiff to be able to occasionally reach overhead.  It was, as plaintiff notes, inconsistent for the ALJ to rely

upon the FCE and apparently Dr. Kennedy's opinion but adopt a different restriction than they assessed. The ALJ also found that plaintiff's hand tremors were slight and permitted plaintiff to engage in fine and gross movements with his hands. (Tr. 19-20). Dr. Feinerman indicated plaintiff could perform fine and gross manipulation despite tremors. (Tr. 561). However, the most recent FCE indicated plaintiff's ability to perform fine and gross motor skills was impacted by the tremors and would not permit frequent fingering. (Tr. 580). The ALJ did not mention this within her opinion.

The ALJ is required to identify medical evidence she relied upon that substantiated her conclusions. SSR 96-8p. The Seventh Circuit has held that an ALJ must identify and explain how the evidence on record led to her conclusions; it is not enough for the ALJ to indicate, generally, there is evidence that supports her decisions. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)

Plaintiff's record also contains evidence of mental illness and headaches. (Tr. 53, 672-74, 759-60, 775-76). The ALJ found plaintiff to have a mild restriction in social functioning and limited him to simple instructions and routine tasks as a result. (Tr. 15). There is no restriction for interactions with others or relating to social functioning. The ALJ was required to consider the effects of plaintiff's non-severe depression and anxiety on the RFC assessment. *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008). The ALJ also noted plaintiff's reported headache pain but found the claims inconsistent since plaintiff reported headaches to his physical therapists but not his treating physicians. (Tr. 19, 672, 673, 674, 685). However, plaintiff claimed his headaches were brought on by activity. His treating sources did not ask him to engage in physical activities and it would follow that he told his physical therapists about his headaches when he was doing physical activities.

The ALJ is required to consider how all of plaintiff's impairments, both severe and non-severe, impacted her RFC assessment. *Craft*, 539 F.3d at 668. Her failure to do so is error and requires remand. Reconsideration of plaintiff's RFC assessment will also require a "fresh look" at the medical opinions. *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014). It is therefore unnecessary to analyze plaintiff's other point in detail. The Court nevertheless makes the following observations with regard to the weighing of the medical opinions.

Plaintiff's final argument is that the ALJ failed to appropriately consider the opinions of plaintiff's treating physicians. A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski*, 245 F.3d 881. The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions.  See, 20 C.F.R. §404.1527(c). In a nutshell, "[t]he

regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

The ALJ here analyzed the opinions on record and felt that Dr. McElheny's treatment notes did not support his ultimate findings, and some of Dr. Kennedy's determinations were also unsubstantiated.  She felt that Dr. Kennedy's opinion that plaintiff would need to alternate sitting, standing, and walking was not supported by the record, primarily because Dr. Feinerman found plaintiff to be able to sit, stand, and walk normally.  As plaintiff notes, the Seventh Circuit has held that a claimant's ability to walk fifty feet in a doctor's office does not equate to the ability to sit, stand, and walk for six hours out of a workday. *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011).

Further, the ALJ felt Dr. McElheny relied on plaintiff's subjective allegations too heavily. The ALJ appropriately found plaintiff less than credible and therefore the subjective allegations of plaintiff would not be an adequate standalone basis for a doctor's opinion. However, it is important to note that a doctor is allowed to rely upon their patient's reported symptoms, and doctors generally do not prescribe medications if they believe the patient is exaggerating. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004); *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Spencer is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## <u>Conclusion</u>

The Commissioner's final decision denying Craig Spencer's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is **DIRECTED** to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** 3/27/2017

*s/J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**
